**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

JOSEPH P. MORAN, III,
     Appellant,

     v.                       C.A. No. 11-494-ML

CITY OF CENTRAL FALLS,
     Appellee

**DECISION AND ORDER**

Mary M. Lisi, Chief Judge.

This case involves a dispute that arose during bankruptcy proceedings under Chapter 9 initiated by the state-appointed receiver (the "Receiver") for the City of Central Falls (the "City"). The matter before this Court is an appeal from a final order (the "Order") of the United States Bankruptcy Court for the District of Rhode Island (the "Bankruptcy Court"). The appeal seeks reversal of the Bankruptcy Court's Order authorizing the Receiver to reject an employment contract (the "Contract") between the City and Joseph P. Moran, III ("Moran"), pursuant to which Moran was engaged to serve as "Colonel" of the Central Falls Police Department ("CFPD") for a period of five years.

## I. Factual Background and Procedural History

On March 23, 2010, Moran retired from his position as Chief of Police of the CFPD and began collecting retirement benefits under a pension plan maintained by the City. City Mem. 1-1, n. 1. On

1

March 24, 2010, the City entered into the Contract appointing Moran as "Colonel" of the CFPD for the period of January 11, 2010 through January 11, 2015.  Contract, Appellant Appx. 3a - 29a.  It is undisputed that the Contract provided for compensation and benefits that exceeded those of other non-union employees of the City, including, *inter alia*, additional days for vacation, holidays, personal leave, and sick leave, as well as annual bonuses for longevity and the cost of obtaining a Masters Degree. City Mem. 1. The Contract made Moran the only non-union City employee who could not be terminated at will.  Id.  Moran was also continuing to collect retirement benefits under the City's pension plan, while receiving compensation under the Contract.

The City, which had been in financial difficulties for some time,[1] petitioned for appointment of a receiver on May 18, 2010. In the period between May 19, 2010 and July 16, 2010, Attorney Jonathan Savage served as receiver for the City.  On July 16, 2010, retired Superior Court Justice Mark Pfeiffer ("Pfeiffer") was appointed as receiver.  Pfeiffer informed the City's  mayor that, pursuant to R.I. Gen. Laws § 45-9-7,[2] he had assumed the duties and

---

[1]

For details regarding the City's financial situation and the efforts by respective receivers to cut expenses, see Moreau v. Flanders, 15 A.3d 565 (R.I. 2011).

[2]

R.I.Gen.Laws § 45-9-7 provides the Receiver with the following powers:

functions of the office of mayor[3] (including the function of public safety director) and that the mayor's responsibility would be limited to serving in an advisory capacity at a reduced rate of compensation.  Moreau v. Flanders, 15 A.3d at 572.

On February 1, 2011, retired Supreme Court Justice Robert Flanders (hereinafter referred to as the "Receiver") was appointed as Receiver for the City.  On August 1, 2011, the Receiver, on the City's behalf, filed a petition for relief under chapter 9 of the Bankruptcy Code.  Memorandum of Decision *2 In re City of Central Falls, Case No. 11-13105-FJB, (Bkrtcy. D.R.I. Nov. 2, 2011).

By letter dated September 7, 2011, the Receiver informed Moran that the Contract was terminated, rejected, and deemed immediately unenforceable and that a motion to reject the Contract had been

---

(1) All powers of the fiscal overseer and budget commission under §§ 45-9-2 and 45-9-6. Such powers shall remain through the period of any receivership;

(2) The power to exercise any function or power of any municipal officer or employee, board, authority or commission, whether elected or otherwise relating to or impacting the fiscal stability of the city or town including, without limitation, school and zoning matters; and

(3) The power to file a petition in the name of the city or town under Chapter 9 of Title 11 of the United States Code, and to act on the city's or town's behalf in any such proceeding.

[3]

A subsequent attempt by the mayor and City council to challenge the constitutionality of Chapter 9 of Title 45 was rejected by the Supreme Court of the State of Rhode Island. Moreau v. Flanders, 15 A.3d at 574-578 (holding that receivership provisions do not alter the form of government of the City in contravention of the Home-Rule Amendment of the Rhode Island Constitution).

3

filed with the Bankruptcy Court. Appellant's Appx. 206a.  The letter further stated that "[i]f you elect to continue in your position, the terms of your employment with the City as of September 8, 2011 shall be as follows," and set forth a number of new compensation and benefit provisions. Id. at 206a.  In essence, the referenced benefits were brought in line with those afforded to other non-union City employees. *Inter alia*, the annual base salary was kept at the same level as under the Contract, but payments for longevity and the Masters in Arts Degree were eliminated.  The employee contributions for health care and dental insurance were raised from 7% to 20%. Time for holidays, vacation, sick leave and personal days was reduced.  Id. at 207a.  Instead of a five-year term, Moran was to be designated "an exempt employee at will."  Id. With respect to that particular provision, the letter stated:" You may elect to remain in your position and render services to the City in accordance with these terms, as an employee at will, subject to termination without notice and without cause."  Id. at 207a-208a.

On September 8, 2011, the City filed a motion with the Bankruptcy Court seeking an order authorizing rejection of the Contract as of July 31, 2011, the day prior to the bankruptcy filing. Memorandum of Decision 2.  The City represented that Moran was the only non-union employee whose employment was not at will and that the Contract impeded the City's ability to modify the

4

terms of his employment in order to treat all City employees consistently and fairly. Id.   According to the City, it had concluded, "[i]n the exercise of its business judgment," that the Contract was burdensome.  Such determination was based, in part, "on the recommendation contained in a certain public safety report" that the positions of police and fire chief be eliminated and consolidated into one position.  Id.  The City's motion was limited, however, to rejection of the Contract; it did not seek approval of the contemplated consolidation.  Id. n. 2.

The referenced report, dated September 6, 2011, (the "Report"), is a 45-page document on staffing requirements for the City's Police and Fire Departments issued by the Public Safety Strategies Group ("PSSG"), a private management consulting firm. Appellant's Appx. 209a to 255a.  The Report was based on PSSG's review of documents including Collective Bargaining Agreements, IMC Data Records 1995 - April 2011, Budgets, and other related information.  Id. at 211a.  The Report noted that it was based on document review only and that PSSG did not rely on interviews, review of job descriptions or surveys.  Id.  In the Report summary, PSSG concluded that the City could "reduce its budget in the short term through the reduction of command positions on both the police and fire departments."  Id. at 255a.  For a long term strategy, PSSG strongly recommended (1) consolidation of police/fire administration, (2) merger of police and fire services with a

neighboring town, and/or (3) consolidating with dispatch on the state level or with a neighboring community.[4]

On September 8, 2011, the Receiver filed a motion with the Bankruptcy Court seeking (1) an order authorizing the City's rejection of the Contract pursuant to 11 U.S.C. § 365(a), and (2) a further order specifying that the Contract was terminated effective on July 31, 2011. Memorandum of Decision at 2.  The City pointed out that it had negotiated significant benefit reductions with its other employees in an effort to navigate through the bankruptcy.  It also asserted that the Contract restricted the City's ability to modify employment terms for Moran - who was the City's only non-union employee whose employment was not at will - and that it was "necessary to treat all City employees consistently and fairly."  Id.  The City stated further that, in its business judgment, based, in part, on the Report, it had concluded that the Contract was burdensome and should be rejected. Id.  According to the City, Moran's compensation and benefits were excessive and fiscally too expensive.  Id.  The City's conclusions were further supported by declarations of Gayle Corrigan ("Corrigan"), the Receiver's chief of staff (who functioned as the City's day-to-day manager), who added that terminating the Contract would save the

---

[4]
The Court notes that the City's 19,000 inhabitants live within a 1.2 square mile area. Moreau v. Flanders, 15 A.3d at 569.

City $115,340 annually. <u>Id.</u> at 2-3. Although the City acknowledged that it would not be able to follow the recommendation in the Report that it consolidate the positions of chief of police and fire chief unless the Contract was first rejected, it did not seek approval from the Bankruptcy Court to engage in such consolidation at that time. <u>Id.</u> n. 2.

In opposition to the City's motion, Moran argued that (1) rejection of the Contract and elimination of his position violated provisions of the Rhode Island Constitution and City Home Rule Charter; (2) the City exceeded its authority by deeming the Contract rejected prior to entry of an order approving rejection; and (3) rejection of the Contract was not based on sound business judgment, but on "whim and caprice," because it was based, at least in part, on the Report that Moran considered unsound. <u>Id.</u> at 3.

On September 15, 2011, Moran wrote an 8-page letter to the Receiver regarding the Report, with copies to the Rhode Island U.S. Senators and Congressmen, the U.S. Attorney, the State Attorney General, the State Police Superintendent and the President of the Fraternal Order of Police Lodge #2. Appx. 256a - 264a. Moran took issue with PSSG's methods and with all of the Report's recommendations,[5] and he suggested that PSSG "visit the police and

---

[5]

The letter does not address the terms the Receiver set out for Moran's continued employment, nor is there any indication that Moran responded directly to the Receiver's September 7, 2011 letter. However, at a hearing before the Bankruptcy Court on

fire departments, prior to making blind recommendations based on statistical data, and speak with several personnel, including the respective Chiefs." Id. at 263a.  With respect to the suggestion that the position of police and fire chiefs be consolidated into a Public Safety Director position, Moran noted that "[t]here is no discussion on the qualifications or job description that the position of Public Safety Director would do relating to the Police and Fire Department.  This study also does not provide a cost/benefit analysis relating to that position.  Currently, the acting Fire Chief, and Police Chief live in the city of Central Falls for the first time in about twenty-five or so years." Id. at 262a.

On September 22, 2011, the Receiver, on behalf of the City, filed a Plan (the "Plan") for the Adjustment of Debts, which included a five-year projected budget.  Appx. 265 - 342a.  The Plan dramatically[6] decreased the benefits of police, fire and municipal retirees with respect to health insurance, accidental disability, and annual pension plans.  Id. at 280a - 281a.  The Plan also provided that, regarding any executory contracts "the City elects

---

October 19, 2011, Moran's counsel stated that, with respect to that letter, Moran "never objected to that" and that "if they had asked him to take [$] 20,000 less, he may have accepted that."  Tr. 34:7-9.

[6]

Under the Plan, at least one class of retirees "would receive an annual pension benefit of 45% of their prior pension benefit." Id. at 281a.

8

to reject, the City shall file a Rejection Motion within 60 days from the Effective Date[7], which if granted shall cause the City to reject such contracts . . . pursuant to [an] order of the Bankruptcy Court." Id. at 290a.  Any executory contract for which no explicit assumption/assignment motion was filed was also deemed to be rejected.  Id. at 291a.

By letter dated September 23, 2011, the Receiver informed Moran that, effective immediately, Moran was relieved of duty and his employment with the City was terminated.  Appx. 343a.

On October 19, 2011, the Bankruptcy Court held a hearing on the City's motion to reject the Contract.  See Transcript ("Tr.") Appx. 30a - 62a.  At the hearing, the City asserted that, based on the Report and Corrigan's assessment, it had determined that the positions of chief of police and fire chief could be consolidated without compromising public safety.  Tr. 14:2-15:8.  The City argued that its business judgment should not be substituted by the Bankruptcy Court's judgment.  Tr. 15:21-25.  The City rejected Moran's suggestion that consolidating the two positions would constitute a permanent alteration of the City's form of government, thereby violating the Rhode Island Constitution and the Home Rule Charter.  Id. 17:8-12.  The City suggested that the position of

---

[7]

Effective Date is defined as "the thirtieth (30th) day after the [Bankruptcy] Court enters a Final order confirming this Plan." Id. at 272a.

chief of police did not fall within the framework of the local government, Tr. 17:19-23, and that, moreover, any changes made in the course of the receivership would only be temporary.  Tr. 21:3-18.

At that point in the proceedings, the Bankruptcy Court clarified that the motion before him was limited to the City's request for authorization to reject the Contract.  Tr. 21:19-22. The Court noted that the City had not sought approval of any aspect of the submitted Plan, including the possible consolidation of the fire chief/chief of police positions.[8]  Tr. 21:22-22:7.  The Court also pointed out that the City could conceivably ask for approval to reject the Contract and then hire a new chief of police or renegotiate with Moran, but that "everything that's being said about home rule, to my way of thinking, isn't really relevant." Tr. 22:12-14.

Moran, disagreeing with the Court's assessment regarding the relevancy of home rule discussions, Tr. 23:21-24, suggested that the broad powers of the Receiver should conform with Rhode Island State laws, the Rhode Island Constitution, and the City's Home Rule Charter.  Tr. 24:18-23.  Moran also appeared to suggest that bad faith and gross abuse of power were involved in the decision to

---

[8]

The position of fire chief had already been eliminated by attrition and the police and fire departments were managed by majors within the respective departments.  Tr. 22:23-23:14.

reject the Contract and/or consolidate the two positions because the two previous receivers had limited their budgetary measures to reducing costs and staff after conferring with Moran.  Tr. 25:16-26:4.  By contrast, the current Receiver had engaged an outside company which assessed the City's staffing needs without discussions or interaction with Moran.  Tr. 26:5-7, 27:20-23. Moran asserted that the rejection of the Contract prior to Court approval constituted gross abuse of the position of the Receiver and that, moreover, the termination of Moran's employment was a breach of the terms of the Contract.  Tr. 30:7-15.  Moran further argued that the Contract was rejected and his employment terminated because the City planned to consolidate two positions into that of a public safety director, but that "the Home Rule Charter does not provide for this at all, so clearly it's a violation of the Home Rule Charter." Tr. 30:16-23.  According to Moran, the appointment of a public safety director was "a complete change in restructuring of the affairs how the City of Central Falls is managed and operates. It's not temporary. It's not incidental."  Tr. 33:11-18.

In response, the City reiterated that the issue before the Bankruptcy Court was limited to determining "whether or not the receiver has the power and the City has the power to reject this contract if it determines that it's burdensome."  Tr. 36:8-11.  The Bankruptcy Court only had to decide whether  "there was a business judgment, was there a basis for the business judgment, not whether

the Court agrees with the business judgment." Tr. 37:13-15.  The
City also rejected Moran's assertion, made without further factual
support, that the proposed change was permanent.  Tr. 37:16-20.
With respect to the City's request that the termination of the
Contract be made effective as of July 31, 2011, the City explained
that, pursuant to 11 U.S.C. § 365, Moran would have a claim
regarding the terminated Contract as of the date of the bankruptcy
filing (August 1, 2011).  Tr. 39:18-40:3.  Moran objected to the
proposed date and suggested that, if the termination were to be
granted, it should be effective on the date the Bankruptcy Court
granted the order.  Tr. 40:18-20.

The Bankruptcy Court took the City's motion under advisement.
On October 20, 2011, the Court granted the motion.  The Bankruptcy
Court noted that it made no ruling as to the effective date of the
rejection, except that it was effective no later than the entry
date of the order.  October 20, 2011 Order, Appellant's Brief at 29
-30.

On October 24, 2011, Moran filed an appeal of the Order,
electing to opt out of the Bankruptcy Appellate Panel for the First
Circuit and requesting that his appeal be heard by this Court.
(Docket # 1).

On November 2, 2011, the Bankruptcy Court issued a Memorandum
of Decision, noting repeatedly that the City had not sought
approval of the planned consolidation of the fire chief and the

12

chief of police positions.  Memorandum of Decision at 2 n. 1, at 5 ("The City asks the Court to approve rejection of Moran's contract, nothing more"), and at 6 ("The only matter before the Court for approval is the City's rejection of Moran's contract").

The Bankruptcy Court approved the Receiver's rejection of the Contract after making the following determinations: (1) Pursuant to 11 U.S.C. § 365, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Memorandum of Decision at 5.  (2) Moran conceded that the Contract was executory. Id. (3) Rejection of the Contract is appropriate if the City "has concluded, in the sound exercise of its business judgment, that rejection is in the best interest of the estate."[9]  Id. at 7. (4) "On facts the City has alleged and Moran has not disputed, the City has established that the Receiver's decision to reject Moran's contract is well within his business judgment." Id. at 8.  The Bankruptcy Court noted that "Moran's opposition goes entirely to the legal and practical soundness of the Receiver's plan to replace the fire and police chiefs with a Director of Public Safety," but it concluded that the established facts, on their own, justified the Receiver's decision. Id.

---

[9]

The Bankruptcy Court held that the same standard applied in a Chapter 9 case as in cases under Chapter 7 or Chapter 11 and it rejected the City's suggestion that "a court should be even more reticent to substitute its judgment for that of a municipal debtor." Id. at 7.

With respect to the effective date of the City's rejection of the Contract, the Bankruptcy Judge noted that, with the assent of both parties, he would make no ruling, "reserving that question for a later decision only if and when it becomes relevant to disposition of a rejection-related claim." Id. at 5.

Following the October 24, 2011 preliminary filing of the bankruptcy appeal (Docket #1), Moran filed a Notice of Appeal in this Court on December 20, 2011. (Docket #2). On February 23, 2012, the parties submitted briefs setting out their respective positions (Appellant's Brief, Docket #16; Appellee's Brief, Docket #15). On March 8, 2012, the City responded with a reply brief. (Docket #18).

## II. Standard of Review

Pursuant to 28 U.S.C. § 158, this Court has jurisdiction to hear appeals from final orders of a bankruptcy court. 28 U.S.C. § 158(a). The Court reviews rulings of law *de novo* and findings of fact for clear error. In a *de novo* review, the Court is required to "make a judgment independent of the bankruptcy court's, without deference to that court's analysis and conclusions." In re Guilbert, 176 B.R. 302, 305 (D.R.I. 1995)(citation omitted).

A bankruptcy court's findings of fact are not set aside "unless they are clearly erroneous . . . A finding of fact is clearly erroneous, although there is evidence to support it, when the reviewing court, after carefully examining all the evidence, is

14

'left with the definite and firm conviction that a mistake has been committed.'" Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997)(Citations omitted).   If the parties "'do not specifically contest the bankruptcy court's finding of fact,'" the reviewing court will not disturb such rulings on appeal.  In re Joelson, 427 F.3d 700, 702 (10th Cir. 2005)(citation omitted); In re PMC Marketing Corp, 447 B.R. 71, 75 (D.P.R. 2011).

### III.  The Parties' Positions

Moran argues that the Receiver exceeded his power by rejecting the Contract and terminating Moran's employment because it "permits the reorganization of the structure of government in the City of Central Falls" by "eliminating the position of Chief of Police and Fire Chief to be consolidated into a[n] entirely newly created position of Director of Public Safety."   Moran Mem. at 11-12. Moran asserts that the Receiver's acts are "in violation of the intent and purpose of Chapter 9 of the Bankruptcy Code, Article XIII of the Rhode Island Constitution and the Home Rule Charter of the City of Central Falls." Id. at 12.   Moreover, Moran suggests that rejection of the Contract is not the result of sound business judgment, "but rather is the product of bad faith, whim and caprice," based on an "unreliable, flawed Report." Id.

At the outset, the City submits that Moran failed to raise the issue he now submits on appeal: whether Chapter 9 of the Bankruptcy Code "permits the re-organization of the structure of municipal

government, as opposed to re-organization of its financial affairs." City Mem. at 4. The City further argues that the Bankruptcy Court's decision was limited to determining whether the City appropriately rejected the executory Contract and that such rejection has no bearing on the structure of municipal government. Id. The Receiver's authority to reject the Contract pursuant to Section 365(a) of the Bankruptcy Code, once such rejection has been factually supported, is limited only by the Bankruptcy Court's approval. Id. Neither the City's Home Rule Charter nor the Rhode Island Constitution were violated by rejection of the Contract because the rejection does not affect the City's form of government. Id. at 5. While the City satisfied the business judgment standard for rejection of executory contracts, Moran failed to demonstrate that the City's rejection of the Contract was based on bad faith, whim or caprice. Id.

**IV. Discussion**

(A) The Issue Framed

As the Bankruptcy Judge repeatedly pointed out during the October 19, 2011 hearing and reiterated in his detailed November 2, 2011 memorandum, the motion before him was limited to the Receiver's request for approval to reject the Contract the City had entered into with Moran just prior to seeking receivership. See, e.g., Tr. 21:20-22:15; BR Memorandum at 6 ("The only matter before

16

the Court for approval is the City's rejection of Moran's contract.")  No decision was sought or delivered with respect to the City's contemplation of eliminating the positions of chief of police and fire chief and consolidating their respective responsibilities by hiring a "Public Safety Director."  B.R. Memorandum at 2 n.2.

The question which Moran now raises on appeal, whether Chapter 9 of the Bankruptcy Code "permits the re-organization of the structure of a municipal government as opposed to reorganization of its financial affairs" was not before the Bankruptcy Court and cannot be raised, for the first time, on appeal.  See, e.g. In re Watson, 403 F.3d 1, 7 (1st Cir. 2005)("The rule that a party may not raise an argument for the first time on appeal is elemental.")(quoting In re Carp, 340 F.3d 15, 26 (1st Cir. 2003)).

Although the City based its decision to terminate the Contract, at least in part, on the recommendation that the positions of fire chief and chief of police be eliminated and consolidated, the legality of that potential restructuring was not before the Bankruptcy Court. Regardless of any future plans the City had for Moran's position, it first had to support its decision to terminate the Contract under 11 U.S.C. § 365(a) in order to gain approval of that rejection from the Bankruptcy Court.

(B) Rejection of the Moran Contract

Pursuant to Subsection 365(a) of the Bankruptcy Code, a debtor-in-possession (or, as in this case, the Receiver) is authorized, subject to the bankruptcy court's approval, to assume or reject any pre-petition executory contract.   11 U.S.C. § 365(a)[10].  As stated by the U.S. Supreme Court, "the authority to reject an executory contract is vital to the basic purpose to a Chapter 11[9] reorganization because [it] can release the debtor's estate from burdensome obligations that can impede a successful reorganization." N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)(noting that the debtor-in-possession has "a broad power to assume or reject executory contracts," (subject to certain situations which are inapplicable in the instant case)).  The debtor-in-possession "may make this decision at any time prior to the confirmation of the plan" which allows the debtor-in-possession "to determine which of the prepetition executory contracts are beneficial to the estate and which should be assumed or rejected." In re FBI Distrib. Corp.,

---

[10]

Section 365(a) provides:
Except as provided in Sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.  11 U.S.C. § 365(a).

[9]

Section 365 applies in a Chapter 9 case.  11 U.S.C. § 901(a).

330 F.3d 36, 42 (1st Cir. 2003).

Although the Bankruptcy Code does not define "executory contract," legislative history indicates that the term refers to a contract "'on which performance is due to some extent on both sides.'" In re FBI Distrib. Corp., 330 F.3d at 40 n.5 (citation omitted). In this case, it is undisputed that performance under the Contract had occurred only for a fraction of the five year term. Moreover, Moran has previously conceded that the Contract is executory in nature. See BR Memorandum at 3, 5.

The decision of a receiver to reject an executory contract is reviewed under the business-judgment rule, which consists of a determination of what is "in the best interest of the estate." Butler v. Resident Care Innovation Corp., 241 B.R. 37, 44-45 (D.R.I. 1999)(holding that "in confronting the question of rejection, a court looks to see whether the decision to reject an executory contract is in the best interest of the estate under the 'business judgment test')(citing Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 318 U.S. 523, 550, 63 S.Ct. 727, 87 L.Ed. 959 (1943)).

The Bankruptcy Court's review of the Receiver's decision to reject the Contract was limited to a determination whether such decision was made with sound business judgment. In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993)(citing Matter of

19

Minges, 602 F.2d 38, 43 (C.A. Conn. 1979)(bankruptcy court reviewing decision to assume or reject executory contract "should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate"). In other words, "the bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." Id. "'The business judgment rule requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Helm, 335 B.R. 528, 538-539 (Bankr. S.D.N.Y. 2006)(citation omitted).

Once the debtor or trustee has established that the rejection benefits the estate, "'the non debtor party bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice.'" Id. (quoting In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D.N.J. 2002)).

The facts in this case are essentially undisputed. The City has been in a financial crisis for some time. The five-year Contract between the City and Moran was entered into less than two months before the Mayor and City Council filed a petition for receivership in Rhode Island state court. Pursuant to the Contract,

Moran, who was also collecting retirement benefits under a pension plan maintained by the City, was the only non-union City employee whose employment was not "at will." Moran's compensation and benefits under the Contract were significantly more favorable than those provided to other City employees. As such, not only did the Contract, by its terms, constitute a significant financial burden on the City, it also presented difficulties for the City's efforts in restructuring its fiscal obligations in a fair and consistent manner.

By contrast, Moran's allegation that the Receiver's rejection of the Contract was the result of "bad faith, whim, or caprice " are entirely unsupported. Neither Moran's personal disagreement with the Report recommending consolidation of two positions into that of a Public Safety Director nor the fact that previous receivers had not elected to reject the Contract serve to bolster such allegations.

In sum, the Bankruptcy Court applied the correct legal standard in reviewing the City's request for approval to reject the Contract. Moreover, the facts in this case, as they pertain to the City's determination that the Contract was "burdensome," are essentially undisputed and fully support the Bankruptcy Court's conclusion that the City had met its burden under the business judgment test.

## Conclusion

For the foregoing reasons, Moran's appeal from the judgment entered by the Bankruptcy Court is DENIED.  The Bankruptcy Court's decision that the Receiver acted properly in exercising his business judgment to reject the Contract is AFFIRMED.


SO ORDERED.


/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge

May 4, 2012